397 So.2d 699 (1981)
ALEXANDER/DAVIS PROPERTIES, INC., Dorothy Pearigen, Sally Alexander, Shade Murray, Jr. D/B/a C.D. Joint Venture, First & Mid South Advisory Co., Willie K. Davis, Franklin G. Clark, Michael G. Shears, John A. Thweatt, Richard H. Botts, David F. Clark, Dennis E. Clowers, David K. Ward, O. William Long & Glenn Eubanks D/B/a C.D. Joint Venture, Whom among Others Are Named As Members of C.D. Joint Venture, Appellants,
v.
David E. GRAHAM and Roberta Jane Graham, His Wife, Appellees.
FIRST & MID SOUTH ADVISORY COMPANY, Willie K. Davis, Franklin G. Clark, Michael G. Shears, John A. Thweatt, Richard H. Botts, David F. Clark, Dennis F. Clowers, David K. Ward, O. William Long, Glenn Eubanks, Who among Others Are Named As Members of C.D. Joint Venture, and Alexander/Davis Properties, Inc., Appellants,
v.
David E. GRAHAM and Roberta Jane Graham, His Wife, Appellees.
Nos. 77-2168, 77-2193 and 77-2223.
District Court of Appeal of Florida, Fourth District.
March 4, 1981.
Rehearing Denied May 21, 1981.
*700 Davis W. Duke, Jr., of McCune, Hiaasen, Crum, Ferris & Gardner, Fort Lauderdale, for appellants First & Mid South Advisory Co., Willie K. Davis, Franklin G. Clark, *701 Michael G. Shears, John A. Thweatt, Richard H. Botts, David F. Clark, Dennis F. Clowers, David K. Ward, O. William Long and Glenn Eubanks, who among others are named as members of the C.D. Joint Venture.
Terrence J. Russell and Steven J. Gutter of Ruden, Barnett, McClosky, Schuster & Schmerer, Fort Lauderdale, for appellants C.D. Joint Venture, Alexander/Davis Properties, Inc., Dorothy Pearigen, as Executrix of the Estate of James Pearigen, Deceased, and Sally Alexander, as Executrix of the Estate of Charles F. Alexander, Deceased, whom among others are named as members of C.D. Joint Venture.
William Robert Leonard of Coleman, Leonard & Morrison, Fort Lauderdale, as additional counsel for appellant Shade Murray, Jr.
Gerald Mager of Abrams, Anton, Robbins, Resnick, Schneider & Mager, Hollywood, and Louis N. Scholnik of Graham, Hodge, Larson & Hume, P.A., Fort Lauderdale, for appellees.
PER CURIAM.
These are consolidated appeals by members of a joint real estate development venture from a final judgment entered against them and in favor of another partner. The principal contention raised on appeal is that the trial court erred in determining that appellants, hereafter referred to as the Mid-South group, were guilty of fraud in inducing the appellee, David Graham, to forebear from meeting certain obligations of the venture. We reverse.
The appellee, David E. Graham, an attorney, entered into a contract to purchase one hundred and twenty (120) acres of farm land from Virgil Green for $1,620,000.00 to be paid $405,000.00 in cash and $1,215,000.00 to be paid in the form of a promissory note secured by a purchase money mortgage. The first payment on the note, in the amount of $121,500.00, principal plus accrued interest, was due on October 1, 1974, with a similar payment due each year for nine years thereafter. Twenty acres of the property was to be released free and clear of the mortgage at the time of closing.
On September 6, 1973, Graham and the Mid-South group entered into an agreement by which Graham agreed to sell a substantial interest in the Green contract. This agreement was superseded by a second agreement executed on November 19, 1973. Finally, the parties executed a joint venture agreement on November 20, 1973.
In the November 19th agreement, Graham agreed to assign seventy percent (70%) of his interest in the Green contract to the Mid-South group for $1,500,000.00 to be paid by a note to be executed by the joint venture and secured by a second mortgage against the property, title to which was to be taken in the name of a trustee for the benefit of the joint venture. The parties agreed to enter into a joint venture for the purposes of owning, developing, financing, and selling the subject property, with Graham to contribute his 30% interest in the Green contract to the venture, and Mid-South, its 70% interest. Mid-South agreed to loan $605,000.00 to the venture to secure the purchase of the property pursuant to the Graham-Green contract.[1] Of that sum, *702 $405,000.00 was to be used to purchase the property from Green, $150,000.00 was to be loaned by the venture to Graham, and $50,000.00 was to be used as working capital for the venture. In the agreement, Graham warranted that the property was presently being rezoned to planned unit development status and that water and sewer facilities would be available on the property by June of 1974.
The joint venture agreement of November 20th expressly provided that one of its purposes was to borrow or raise monies to pay the Green mortgage. Shade Murray, Jr., one of the appellants, was designated to be the managing partner of the venture, and was granted "exclusive power to manage, operate and determine the policy of the Venture." Graham was to have no control of the venture business except to act as attorney for the venture. The $605,000.00 loaned by the Mid-South group was to be repaid in full prior to the payment of the Graham mortgage, and Graham was to subordinate his mortgage to that loan and to any other loans secured by the venture. With respect to the responsibilities of the partners, the joint venture agreement provided in part:
6. LIABILITIES OF PARTNERS. While all members of the Venture are partners in said Venture, it is specifically understood and agreed that various members of the venture have specific responsibilities.
Graham shall personally guarantee and be fully responsible for the payments on the Green Purchase Money Mortgage and all other members of the venture shall have no responsibility for said liability except that their interest in the land purchased from the Greens shall be liable for said debt.
All other expenses, liabilities and debts necessary for the carrying out of the purposes of this Venture shall be the responsibility of the Mid-South Group, and Graham shall not be required to assume liability for these said debts, and if a lender does require that he sign any evidence of such debts, he shall be fully indemnified by the other members of the Venture; provided, however, that Graham shall subordinate his interest in the land to development lenders or loans superior to Grahma's [sic] interest as specified herein or in other documents which relate to this venture's business.
Subsequently, Graham was given a note for $1,520,000.00,[2] secured by a purchase money mortgage which expressly provided, as did the Green mortgage, that twenty acres of land would be released from all liens at the time of closing. Thereafter, the transaction closed as agreed, the venture received title to the property, and the venture executed a note to Mr. and Mrs. Green for $1,215,000.00. Liability of the venture and the Mid-South group on both the Graham and Green notes was expressly limited to the value of the property. However, the Grahams personally guaranteed payment of the venture's note to the Greens.
Subsequently, attempts were made to secure water and sewage facilities for the property and to arrange financing of the contemplated development of a multi-unit condominium project on the property. Because of deteriorating market conditions, it was later decided that the project should consist of single family homes. Although it was undisputed at trial that a development *703 loan could not be secured unless water and sewage facilities were available, each side contended that the other was responsible for the failure to secure such facilities. In any case, no facilities were available by June of 1974, as warranted by Graham in the November 19th agreement, and no development loan was ever secured.
In January of 1974, Graham assigned the mortgage he received from the joint venture to the Pan American Bank as security for a personal loan. Subsequently, he assigned the mortgage to the Miami National Bank as security for a personal loan of $600,000.00.
In the summer of 1974, the Mid-South group repeatedly advised Graham of their concerns about going forward or investing more money in the project because of the rapid decline of the real estate and development market in South Florida. The group also expressed concern about the lack of water and sewage facilities and the difficulty in securing financing. They asked for Graham's help in securing a lender or investor to help bail out the project. Because Graham was concerned about his partners' reluctance to continue with the project, a meeting was arranged for August 29, 1974, between Graham and the principal members of the Mid-South group. At the meeting, Graham was advised that no arrangements had been made to make the Green mortgage payment, since his partners were unsure that such payments should be made. However, after a lengthy discussion Graham prevailed upon the partners present to go forward with the project, and it was agreed that the joint venture should make the Green mortgage payment as it became due on October 1, 1974, as well as the initial payment of accrued interest due on the Graham mortgage on November 20, 1974. There was no specific discussion as to where the money would come from to make the two payments, which amounted to over $250,000.00. At the end of the meeting, Graham also requested and received what he described as a "comfort letter" to reassure his bank, which held the Graham mortgage as collateral, that the venture would meet its obligations.[3]
Shortly thereafter, on September 25, 1974, Graham was advised by a local law firm that the venture had retained it to secure releases from the Greens and Grahams on twenty acres of the property as originally agreed. The releases had not been secured at the time of closing in 1973. The joint venture did not make the Green mortgage payment due on October 1, 1974, and Graham was immediately so advised by the Greens. On October 2, 1974, Charles Alexander advised Graham that because of the delay in securing the releases, the joint venture had been forced into default on the Green mortgage and that while the venture's future was uncertain, the releases were necessary in order to determine a plan of action for the balance of the property.[4] *704 In a reply letter, Graham advised Alexander of the delivery of the releases and of his concerns about the venture's status.[5]
Thereafter, the Mid-South group decided not to borrow additional monies or otherwise go forward with the project. The group used the twenty acres of joint venture property as collateral for the $605,000.00 loan originally secured to purchase the property. On October 24, 1974, Graham was notified in writing that the joint venture had decided not to go forward with the project, and would make no payments on the Green and Graham mortgages.
After the expiration of a 30-day grace period, Green filed to foreclose his mortgage. While that suit was pending, the joint venture filed suit seeking payment from the Grahams of a $15,000.00 installment due on the $150,000.00 loan made to David Graham by the joint venture. The two actions were consolidated and Graham counterclaimed for damages against his venture partners, alleging that they had falsely represented their intentions to meet *705 the obligations of the Green and Graham mortgages and to go forward with the development venture. After a non-jury trial, the trial court found in favor of the venture on the promissory note from Graham, but also found the members of the Mid-South group guilty of fraud. The court awarded Graham $1,547,450.00, which included the face value of the Graham purchase money mortgage, as damages, plus $120,000.00 in damages as the value of Graham's thirty percent interest in the released twenty acres.
In essence, Graham claimed in the trial court that his partners had fraudulently led him into believing that they would make the Green mortgage payments with the intent of inducing him into not making the payments so that he would lose his second mortgage. In his brief, Graham summarized his position as follows:
The case presented in the lower court is a saga of a continuing stream of misrepresentation made by the MID-SOUTH GROUP to GRAHAM that arrangements had been made by them as the management entity of the C.D. JOINT VENTURE to fulfill their duty to meet the venture's obligations on the GREEN and GRAHAM mortgages in a timely manner. This is also a tale of conversions of joint venture property by a management group to the detriment of another partner stripped naked of any management power.
Graham's action and the judgment of the trial court thereon were predicated on the following facts being established:
1. That as between the venture partners, the Mid-South group had the obligation to make the Green mortgage payments.
2. That the Mid-South group continuously misrepresented to Graham that it would make such payments.
3. That since Graham was without authority to act for the venture he had no choice but to rely on the Mid-South group to make the payments.
4. That had Graham not been advised that the Mid-South group was going to make the payments, he would have made the payments and preserved the value of his second mortgage.
5. That he was damaged at least to the extent of the loss of the face value of his second mortgage as a result of the Mid-South group's representation that it would make the Green mortgage payment.
6. That he was wrongfully deprived of his 30% proportionate interest in the released 20 acres by reason of the Mid-South group's use of such property as collateral for a loan.
At the heart of the controversy between the parties is Graham's claim that his partners were responsible for the Green mortgage payments. However, in setting out the responsibilities of the partners, the joint venture agreement expressly provided in unambiguous language that Graham would be "... fully responsible for the payments on the GREEN purchase money mortgage...," see quote, supra, page 4. In the face of this provision, Graham points out that the joint venture, rather than Graham, was the primary obligor on the Green note and mortgage and that he, Graham, was only a guarantor. Although we agree that the venture was the primary obligor, the fact remains that, as between the venture partners, the joint venture agreement expressly made Graham fully responsible for the Green mortgage payments. We do not believe there was any substantial competent evidence to support the contention of Graham and the finding of the trial court to the contrary.
What we believe Graham is really claiming is that his venture partners breached that portion of the agreement which made it their responsibility to secure a development loan from which the venture would be funded and the Green mortgage would be paid. As we have noted before, Shade Murray, Jr., was named the managing partner of the venture with the exclusive right to conduct venture business, and one of the primary purposes of the venture was to secure a development loan to pay the Green mortgage and to finance the entire project. *706 The parties obviously anticipated that the project would be a success and that they would have no problem securing a development loan.[6] They failed to foresee the problems involved with securing the water and sewage facilities, and the subsequent collapse of the real estate and development market. Moreover, no provision other than the one making Graham responsible for the Green mortgage and limiting his partners' liability to the value of the land was made as to what was to occur if no loan was secured.
The failure to secure a development loan may well have constituted a breach of the partners' obligation under the various agreements, but even if this were so, we do not believe this breach gave rise to an action for fraud. One of the risks that each party assumes when a contract is made is that the other party may breach the contract. At any time after someone enters into a contract, he may decide that he has made a bad deal. If so, he may elect to default and thereby breach the contract. In a sense, he has a "right" to do so. Of course he must face the consequences and is responsible for damages for the breach. In this regard, we agree with the views expressed in the case of In re Estate of Donner, 364 So.2d 742 (Fla.3d DCA 1978):
Sam may have never intended to abide by his agreement with Ruth. The trial court found that he consciously intended to breach the settlement agreement at his earliest opportunity. That may be so but a willful breach of contract alone, without more, is insufficient in law, to constitute fraud:
"... [T]he fraudulent breach of a contract does not give rise to an action for fraud, and therefore where the only fraud charged relates to a breach of the contract, and not to its inducement or making, no action for fraud exists." 37 Am.Jur.2d Fraud & Deceit § 21 (1968).
The trial court did not find fraud in the inducement nor would the record support such a finding. Moreover, had Sam promised Ruth that he would require his future spouse to waive dower as an inducement to entice her to accept the settlement agreement, this still would not amount to fraud in the legal sense. Harrington v. Rutherford, 38 Fla. 321, 21 So. 283 (1896); Brod v. Jernigan, 188 So.2d 575 (Fla.2d DCA 1966). But see Ashland Oil, Inc. v. Pickard, 269 So.2d 714 (Fla.3d DCA 1972). At p. 749.
Likewise, in the case at hand, there was no finding of fraud in the inducement and we do not believe the record would support such a finding if it had been made.
For fraud to be actionable, the following elements must be made to appear:
(1) a misrepresentation of material fact;
(2) [a] a knowledge of the representor of the misrepresentation, or
[b] representations made by the representor without knowledge as to either truth or falsity, or
[c] representations made under circumstances in which the representor ought to have known, if he did not know, of the falsity thereof;
(3) an intention that the representor induce another to act on it; and
(4) resulting injury to the party acting in justifiable reliance on the representation.
Nantell v. Lim-Wick Construction Co., 228 So.2d 634, (Fla.4th DCA 1969). As a general rule, fraud cannot be predicated upon a mere promise not performed. 14 Fla.Jur., Fraud & Deceit, Section 15. However, under certain circumstances, a promise may be actionable as fraud where it can be shown that the promissor had a specific intent not to perform the promise at the time the promise was made, and the other elements of fraud are established. 14 Fla.Jur., Fraud & Deceit, Section 16.
The trial court and Graham principally relied on two letters to establish a case of *707 fraud against the appellants: the October 3, 1973, letter from the Third National Bank of Nashville and, the August 29, 1974, letter from Charles Alexander. See footnotes 1 and 3, supra. Graham claims that the letter of October 3, 1973, from the Third National Bank amounted to a deliberate misrepresentation by the Mid-South group that it had already secured a commitment to cover the Green mortgage payments; that no such loan commitment had been secured; that such misrepresentation was made to induce him into selling an interest in the Green sales contract to the Mid-South group; that he justifiably relied on the letter in deciding to sell such interest to the group; and that he lost the face value of his second mortgage as a result. We cannot agree.
First, we do not believe the letter represents that a loan has been secured for the entire amount of the Green mortgage. And, if there is any ambiguity in the letter, the only evidence offered at trial to resolve the ambiguity revealed that all of the parties, including Graham, were aware that no loan was being secured to cover the entire Green mortgage. Indeed, numerous documents and memoranda were introduced to establish that the letter referred only to the original $605,000.00 loan and that all the parties knew this. The bank's letter of credit issued to Graham is only one of these. In addition, the letter was not written by the Mid-South group, and the proof established that the letter was written at the request of Graham as assurance that the Mid-South group indeed had the ability to make the cash payments at closing called for in the contract to purchase from Green. The letter was also written after Graham had contracted with the Mid-South group to sell a portion of his interest in the Green sales contract, so it could not have induced him to decide to sell. Further, the September 6th agreement referred to was later superseded, and it was never shown that funds were not available to meet the terms of that agreement as represented.
More importantly, the joint venture agreement executed by the parties made the venture itself responsible for the Green mortgage payments, and as noted previously, Graham, as between the partners, was made primarily responsible to pay the Green mortgage payments. The joint venture agreement itself expressly provided that the securing of a loan to pay the Green mortgage and develop the property was one of its main purposes. It would have been absurd for the parties to make these various agreements if a loan to pay the Green mortgage had already been secured. If such a loan was available, there would be no reason to secure the Green mortgage in the first place. In addition, the evidence demonstrated that all of the parties anticipated that the Green mortgage would be paid by the venture out of a development loan, and that such a loan could not be secured without the assurance of water and sewage facilities for the property. As noted, supra, these facilities were never secured. There is simply no evidence that would justify Graham's reliance on this letter as a representation that financing had already been secured. In short, the proof was virtually undisputed that Graham was not the victim of fraud by virtue of the letter of October 3, 1973.
Graham's claim as to the August 29, 1974, letter from Alexander is similar to and connected with the claim made concerning the October 3rd letter. He claims that the Mid-South group had the obligation to make the mortgage payment; that this letter was an additional deliberate misrepresentation that a loan had already been secured by the Mid-South group to make the payments on the Green and Graham mortgages; that such misrepresentation was made to induce him into not making the Green mortgage payments; that he either could not make the payments because he had no authority to act for the venture, or, alternatively, that he thereafter had no time to secure the funds to make the payments; and that he lost at least the face value of his second mortgage by reason of the group's representation that it would make the Green mortgage payment.
In order for a promise of future performance to serve as a predicate for a claim of *708 fraud, it must be established that the promise was made with the present intention not to comply. There is no evidence here, other than the subsequent failure to complete the promise, that the Alexander letter was written with an existing intent not to comply. The testimony of Alexander and others who testified as to the circumstances surrounding the August 29th meeting was, in fact, all to the contrary. On August 29th, Graham's partners had virtually decided not to go forward with the project. Graham was well aware of their reluctance to go forward and admitted that he was advised at the meeting that no arrangements had yet been made to make the payments. It was for the purpose of convincing them to change their minds about the project that he met with them to begin with. The only evidence received as to the "arrangements" referred to in the letter indicated that the Third National Bank, which provided the original $605,000.00 to get the venture off the ground, would provide the additional funds if such a loan was requested, but no request for an additional loan was made. In other words, a decision was subsequently made that the venture should not make the Green mortgage payment or any other additional investment in the project. This, of course, constituted a breach of the venture's agreement to make the payments, but did not constitute fraud.
There is also no evidence that the letter, written at Graham's request to "comfort" his creditors, was written for the additional purpose of securing his forebearance in making the Green mortgage payments. Graham never informed his partners that he wished to make the payments. In fact, the evidence reflects that the partners had nothing to gain by preventing Graham from acting, and would have been pleased if he had made the payments. Indeed, they had requested his assistance in securing a lender or investor to bail them all out. We also note our holding, supra, that the evidence does not support Graham's contention that it was Mid-South's primary obligation to make the Green mortgage payment.
Under all these circumstances, we do not believe Graham was in a position to justifiably rely on the letters of October 3, 1973, and August 29, 1974, as a reason to avoid making the payments himself if he wished to do so to protect himself and his second mortgage. He was immediately informed when the payment was not made, and, in the 30-day grace period which ensued thereafter, he made no efforts to secure funding for the payment or to secure an extension of time to make the payment.
Graham's contention that he had to act in reliance on his partners' promise to make the mortgage payments since he had no authority to act for the venture, also conflicts with his subsequent assertion that he could and would have acted had he known of his partners' default sooner. As the holder of a junior mortgage and a guarantor of the Green note, he had the authority to act to protect his interest when the venture defaulted on the first mortgage. However, as noted, supra, he did not act then or afterwards.
We also believe proof of Graham's damages in the form of the loss of the face value of his second mortgage was insufficient, since it was predicated on speculation as to the subsequent success of the venture. There was simply no proof that, even had the one payment on the Green mortgage been made, the Graham mortgage would have eventually been worth its full face value. The payment of that mortgage was clearly predicated on the successful continuation of the venture and the development of the land. As to what would have taken place after the initial Green mortgage payment was made, we are left to speculation, and that is simply not enough to sustain an award of damages for fraud. W. Prosser, Law of Torts, § 110 (4th ed. 1971). Cf. George Hunt, Inc. v. Wash-Bowl, Inc., 348 So.2d 910 (Fla.2d DCA 1977).
As to the allegations of wrongful conversion of the 20 acres of property released from the Green and Graham mortgages and used as collateral for the $605,000.00 loan made to the Mid-South group, we agree with Graham that he was entitled to an accounting and to his share of the *709 value of such property over and above the prior lien rights of the appellants in the amount of $605,000.00.[7] The trial court found Graham's 30% interest in the 20 acres to have a value of $120,000.00, which means the entire 20 acres were found to be worth $400,000.00. However, since this is well below the amount the venture owed to appellants, which admittedly constituted a prior lien on the 20 acres, we do not believe Graham is entitled to damages on this claim of conversion. If the partners received more than the amount loaned by using the twenty acres of joint venture property as collateral for the $605,000.00 loan which they secured from the Nashville bank, and then in turn loaned to the joint venture, such fact was not proven below.
The appellants have raised other serious issues which, in view of our ruling as to the lack of substantial competent evidence to support the judgment of fraud, are unnecessary for us to decide.
Finally, the trial court, in awarding the joint venture $45,000.00 plus interest on a $150,000.00 promissory note executed by David and Roberta Graham on November 20, 1973, failed to hold Roberta Graham jointly and severally liable. We believe the trial court erred in that regard. Section 673.118(5), Florida Statutes (1973); see also Forbes v. National Rating Bureau, Inc., 223 So.2d 764 (Fla.2d DCA 1969).
This cause is reversed and remanded for further proceedings in accordance with the terms of this opinion.
DOWNEY, ANSTEAD and HERSEY, JJ., concur.
NOTES
[1] The Mid-South group borrowed these funds from the Third National Bank of Nashville. On October 3, 1973, at Graham's request, the bank wrote him a letter which stated:
 Re: Land Purchase Contract
 Dated September 6, 1973

Dear Mr. Graham:
It is hoped that this letter will serve a two-fold purpose. The first purpose is to assure you that with reference to the above mentioned contract between you and Charles Alexander or assigns as purchaser, our bank has made a commitment to Mr. Alexander et al to provide the funds as required in the above mentioned contract when the terms of the contract have been met.
Secondly, you are presently holding a $100,000 commitment from our bank in lieu of earnest money pending the sale of the Coconut Creek property. We realize that the expiration date on this commitment is November 1, 1973 and we also realize that the sale can not be consummated before the latter part of November. We will be glad at your request to give an extension of this commitment until the end of November.
If you have any questions whatsoever, please get in touch with me or Charlie.
 Yours very truly
 York Lillie, Jr.
 Assistant Vice President
In addition, on October 10, 1973, Graham was provided with an irrevocable letter of credit for $500,000 from the bank to be negotiated by December 1, 1973, upon the filing of a:
SIGNED STATEMENT BY BENEFICIARY THAT DAVID E. GRAHAM HAS FULFILLED HIS OBLIGATIONS UNDER CONTRACT DATED SEPTEMBER 6, 1973 BETWEEN DAVID E. GRAHAM AND CHARLES ALEXANDER OR ASSIGNS AND THAT CHARLES ALEXANDER OR ASSIGNS HAS NOT FULFILLED HIS/THEIR OBLIGATIONS UNDER SAID CONTRACT RELATING TO PURCHASE OF 120 ACRES OF LAND LOCATED IN NORTH BROWARD COUNTY, FLORIDA.
[2] Why this note was not for $1,500,000.00 as provided in the November 19th agreement is not clearly explained in the record.
[3] The letter stated:

Dear David:
We have concluded from our discussion both with you and our Partners here, that it is in the best interest of the C.D. Joint Venture and its obligations under the terms of the Green Mortgage and your mortgage, to provide the funds to satisfy these requirements.
Although we would prefer to find an alternative method of meeting these cash needs, we realize the necessity of keeping the Venture in good standing with its creditors. Consequently, I want to assure you that we have made arrangements to fulfill the terms and conditions of the mortgages in a timely manner.
 Yours very truly,
 ALEXANDER/DAVIS PROPERTIES, INC.
 Charles F. Alexander
 President

[4] Alexander's letter of October 2nd stated:

Dear Dave:
As you know we have been trying to get a full release on the first twenty acres to which we are entitled. You have been further advised that the Greens have signed their release of this twenty acres and that this instrument has been recorded in Broward County. We must have a release from you in order to proceed with any kind of logical plan of action for the balance of the Green Property. All of our actions have been based upon the assumption that this release would be given immediately, upon request, and that no further actions by other parties would be required.
Failure to secure this release has placed us in the position of having to go into default on the Green loan and has caused serious problems in our capacity to meet our obligations. I do not know what action we will take from this point forward, but feel that you should be aware of the fact that we are considering whatever courses of action that may be open to us from point of view of the Joint Venture as well as the Mid-South Group.
 Yours very truly,
 ALEXANDER/DAVIS PROPERTIES, INC.
 Charles F. Alexander
 President

[5] Graham's reply to Alexander stated:

Dear Charlie:
I am in receipt of your letter of October 2, 1974 wherein you state that you have not received the Release from me relative to the Green property.
As I had previously informed you (over a month ago) as well as Dave Gillis by phone and your attorney, Mr. Laz Schneider, upon receipt of his letter requesting said Release and delivery of a survey, which letter was delivered and received the 26th day of September, the Release was prepared and forwarded to Miami National Bank, who presently holds an assignment on the subject mortgage.
The letter from Mr. Schneider, as well as your letter dated October 2nd, seemed to indicate that I was in some way dilitory [sic] in delivering your Release. I must point out to you that the Release and survey, as required by the release provisions of the mortgage, were delivered to me late Wednesday afternoon wherein I immediately forwarded it to the bank (by runner) and discussed the problem with the appropriate banking official. The release was promptly executed and returned to me the 1st of October, at which time I called Dave Gillis and asked if I should have it recorded or forward it to Mr. Schneider. My instructions were to forward it directly to Mr. Schneider (who was out of town at that time), which I did.
I am pleased that you are considering whatever courses of action may be open to you from the point of view from the "joint venture" since I am a 30% participant in the venture. I sincerely trust and hope that you and all other individuals involved in the management of the joint venture are doing whatever is necessary to protect my interest. Pursuant to the agreement, I am relying upon you to do that which you have agreed to do, which includes the protection of my interest, the management of the property, the protection of the zoning and whatever financing is necessary.
I also wish to advise you that I have this date received from Mr. Byrd Booth a letter dated October 2, 1974 (a copy attached hereto) advising me that the payment has not yet been received by the Greens on the first mortgage. Demand is herewith made that you immediately cause such payment to be made to protect my interest as a joint venturer and to prevent any default from occurring under the terms of the second mortgage. These matters were thoroughly discussed when I visited you and your attorney in Nashville on August 29th.
I also request at this time a complete accounting on all monies expended on behalf of the joint venture and a complete disclosure of the availability of funds to the joint venture which will enable it to meet its obligations as the same become due and payable. I am making this request as a 30% participant and feel that at this time you have breached your fiduciary duty to me in your failure to keep me informed and in your failure to keep the obligation of the venture current.
I can assure you that although I have in the past expressed complete willingness, both as a participant and a mortgagee to work with you and the other participants in this transaction to find an amicable solution to the present problems and economic conditions, I, also, at this time "feel that you should be aware of the fact that I am considering whatever courses of action that may be open to me".
 Sincerely,
 David E. Graham

[6] Under this plan, Graham, without investing any funds in the project, would have received not only $1,520,000.00 plus interest on the note from the venture but also 30% of the profits of the venture.
[7] We have also considered Graham's claim that Mid-South's use of the 20 acres constitutes additional evidence of fraud. However, we note that Graham himself testified that the group was entitled to the use of the 20 acres and that the release made no difference to him "because they were hocking it anyway to the Third National Bank." We agree that the group continued to assert that it was attempting to work out a plan for the rest of the property but we do not agree that these assertions considered together with the other evidence constituted sufficient evidence to establish a case of fraud.