OCEAN REEF CLUB, INC., Plaintiff,

v.

UOP, INC., Defendant.

No. 78–1838–CIV–EPS.

United States District Court,
S.D. Florida,
Civil Division.

Dec. 20, 1982.

Goldstein, Goldman, Kessler & Underberg, Miami, Fla., for plaintiff.

Mershon, Sawyer, Johnston, Dunwody & Cole, Miami, Fla., for defendant.

## MEMORANDUM OPINION AND FINDINGS OF FACT AND CONCLUSIONS OF LAW

SPELLMAN, District Judge.

THIS CAUSE came before the Court on a non-jury trial. Pursuant to Federal Rule of Civil Procedure 52(a) the following shall constitute Findings of Fact and Conclusions of Law.

## I FACTUAL BACKGROUND

This is a civil action between the Ocean Reef Club, Incorporated, (hereinafter "Ocean Reef" or "ORC") as Plaintiff/Counterdefendant, and UOP, Incorporated (hereinafter "UOP"), as Defendant/Counterplaintiff.[1] The dispute arose out of a service agreement between the parties that covered a reverse osmosis water treatment system located at the Ocean Reef Club in Key Largo, Florida (hereinafter the "System").

Ocean Reef is a residential resort community located in North Key Largo, Florida. There are approximately 2500 residences at Ocean Reef, including a variety of single family and condominium homes, together with a lodge, conference facilities and related amenities such as tennis and golf facilities. The water plant at issue provides the water for drinking and other purposes for the Ocean Reef residents and guests.

Prior to 1971, Ocean Reef obtained all of their water from Florida Keys Aquaduct Authority. However, it was apparent to the developers of Ocean Reef, since 1969, that an alternate source of water would be necessary to meet their expansion plan. Out of the several alternatives they explored, Ocean Reef chose the reverse osmosis plan as the way to provide water in the future.

In 1971, Ocean Reef and Gulf Environmental Systems Company (hereinafter "Gulf") a division of Gulf Oil Corporation, entered into a demineralizing lease whereby Gulf leased to Ocean Reef a reverse osmosis system having a design capacity of 350,000 gallons of product water per day (hereinafter "gpd"). The original 350,000 gpd system was built and went into operation in or about January, 1972.

A reverse osmosis plant produces potable water from brackish well water by passing the well water through a semipermeable cellulose acetate membrane at a pressure of approximately 450 pounds per square inch. The salts and other dissolved solids which do not pass through the membrane, along with the water in which they remain dissolved, are disposed of, and are referred to as "brine" or "concentrate". Approximately 50% of the water introduced into the system passes through the membrane, losing its salts and other dissolved solids in the process. This water, when it emerges from the system, is referred to as "permeate" or "product water."

---

1. The Ocean Reef Club, Inc., is a Florida corporation with its principal place of business at the Ocean Reef Club in Monroe County, Florida. UOP, Inc. is a Delaware corporation with its principal place of business in Des Plaines, Illinois. This Court has jurisdiction over this action based on the diversity of citizenship of the parties and the amount in controversy.

The osmotic process that accomplishes the above takes place in a number of cylindrical "pressure vessels." Pressure vessels are tubes about 20 feet long and four and one half inches in diameter. Originally, the pressure vessels used at Ocean Reef were made of carbon steel but during 1975 the system was outfitted with fiberglass reinforced plastic (hereinafter "FRP") vessels of approximately the same size.[2] Inside each pressure vessel are six "modules" containing the actual membrane. These modules (or "eleneurs") are cylindrical in shape and are placed end-to-end within the vessel. The modules gradually lose their effectiveness through use and need to be replaced periodically.

The original 350,000 gpd system consisted of 144 carbon steel pressure vessels along with certain pre and post treatment equipment. The pressure vessels were grouped into three "skids" or "banks" of 48 tubes each. Those banks have been referred to by the parties as units 1A, 1B and 1C. This system worked in two stages whereby pre-treated "feed" water from Ocean Reef's wells was directed only into units 1A and 1B. The "product" water produced by 1A and 1B was then collected and processed through 1C in order to produce product water which met the prescribed potability standards. The final product water from 1C was then chemically post-treated and distributed.

As Ocean Reef continued to expand their need for water grew. On or about September 29, 1972, Gulf sold the existing 350,000 gpd system to Ocean Reef for the agreed price of $500,000 and agreed to up-grade it by a minor repiping and by installation of new modules which would increase its rated output to 630,000 gpd. That same date, Ocean Reef and Gulf entered into a service agreement whereby Gulf agreed to service and maintain the 630,000 gpd system for five years.[3]

The upgraded 630,000 gpd system that resulted was composed of three banks of vessels. Each bank contained 50 vessels, arranged in five rows of ten vessels each stacked one row on top of another. The design capacity of each bank or unit is 210,000 gpd of product water. In this system, the feed water only had to make one pass in order for the product water to meet the minimum standards.

On May 17, 1973 Ocean Reef purchased an additional bank or unit of 63 vessels, having a design capacity of 300,000 gpd, from General Atomic Company, for an agreed price of $198,000. This additional bank, referred to as unit 2A, had its own filters and pumps, separate and apart from those used for units 1A, 1B and 1C. Construction of unit 2A was completed in April, 1974.

In early 1974, R.L. Truby, UOP's director of marketing, drafted a new service agreement incorporating in large part the provisions of the previous agreements.[4] The new agreement by its terms, pertained to the 630,000 gpd system until the 300,000 gpd went into operation; and, thereafter, to the entire 930,000 gpd system, until the agreement expired on December 31, 1977. This agreement was signed by UOP on March 29, 1974 and forwarded to Ocean Reef for signature. Ocean Reef did not sign it until one year later, on March 19, 1975.[5] It is this service agreement that is the subject of the present law suit.

2. See Section V, *infra.*

3. The parties have stipulated that the ROGA Division of General Atomic Company succeeded to the interest of Gulf in the September 29, 1972 service agreement. ROGA and Gulf were predecessor companies of UOP.

4. The evidence indicates that the liquidated damage clause, discussed in Section IIIA, *infra,* was a carryover clause from the previous agreements and was not the subject of renegotiation in 1974.

5. In connection with Ocean Reef's execution of the service agreement, UOP agreed to repair and refurbish units 1A, 1B and 1C in part by replacing the 150 steel vessels in those units with an equal number of fiberglass reinforced plastic (FRP) tubes and collar assemblies. Each such assembly was composed of one 20 foot long FRP tube, approximately 4½ inches in diameter, with 2 FRP collars approximately five inches in diameter bonded to each end.

Between the signing of the service agreement in March, 1975, and about mid-1977, the relationship between the parties proceeded reasonably smoothly. However, by April or May of 1977 certain banks within the system would not, individually, meet potability standards. In order to get 930,000 gpd of potable water, the output from all four banks had to be blended. Ocean Reef believes that in late 1977 UOP knew the system was not meeting the agreed-upon standards and knew that important, expensive components were needed, but they did not want to put any more money into the plant because the agreement expired at the end of 1977 and they were treating it as a lame duck agreement. Specifically, Ocean Reef claims that the modules in units 1A, 1B and 1C were too old and that immediately after expiration of the service agreement they were required to replace the modules, at the cost of approximately $100,000.00 in order to bring the system's performance up to the standards set forth in the agreement.

## II PROCEDURAL BACKGROUND

The original complaint filed by Ocean Reef alleged that UOP breached the service agreement dated March 24, 1974 between Ocean Reef and General Atomic Company (a predecessor to UOP) whereby UOP was obligated to service and maintain for Ocean Reef a reverse osmosis water treatment system (the "System") at the Ocean Reef Club, Key Largo, Florida. In addition to the breach of contract count [Count I], Ocean Reef's original complaint also alleged UOP negligently performed its obligations under the Service Agreement [Count II] and that UOP fraudulently induced Ocean Reef to enter into the Service Agreement [Count III].

In response to the original Complaint, UOP denied liability and asserted counterclaims alleging (1) that Ocean Reef failed to pay the last 7 monthly payments due under the Service Agreement, amounting to $71,888 [Count I]; (2) that UOP was required, by reason of Ocean Reef's negligent operation, to perform extraordinary repairs and maintenance on the System [Count II]; and (3) that Ocean Reef converted certain spare parts delivered to the System's location in 1976 and stored there when the service agreement expired [Count III].

Ocean Reef admitted in its reply to UOP's counterclaim that it did not make certain payments due under the service agreement for the period June through December 1977, and asserted a number of affirmative defenses to the counterclaims.

In 1979, Ocean Reef was permitted to file an Amended Complaint which added six counts alleging that the fiberglass tube and collar assemblies which were installed by UOP in the system during 1975 were defective. Count IV alleges UOP breached various express warranties; Count V alleges breach of an implied warranty of merchantability; Count VI alleges breach of an implied warranty of fitness for a particular purpose; Count VII alleges breach of the terms of the service agreement by failure to replace all the allegedly defective tube and collar assemblies; Count VIII alleges negligent failure to detect defective tube and collar assemblies; and Count IX claims the assemblies were negligently designed.

In response, UOP denied the material allegations of the Amended Complaint and asserted various additional affirmative defenses, including disclaimer of all warranties, failure of notice, and that the alleged defects were caused by Ocean Reef's negligent and improper operation of the system.

## III ORC'S ORIGINAL COMPLAINT

ORC has plead two alternate theories for recovering the cost of replacing the sys-

---

The evidence establishes that UOP was responsible for the design specifications of the FRP tube and collar assemblies and that they were manufactured by the Amalga corporation, a former division of UOP. The purchase order for the 150 FRP vessels and collars to be installed at ORC was placed with Amalga on May 13, 1975 and by June, 1975 they had been installed, assembled and tested at ORC.

Thereafter, on July 23, 1975, UOP offered to modify unit 2A by installation of 63 FRP vessels and collars to replace the existing carbon steel vessels. Ocean Reef accepted UOP's offer and paid $20,000 for such replacement.

tem's modules. Count I alleges that the failure to maintain the system so that each bank was individually capable of meeting the potability standards set forth in the parties' agreement constitutes a breach of contract. Count II alleges that UOP's failure to properly maintain each bank of the system constitutes negligent performance of their duties under the agreement. Both of these claims are premised on ORC's contention that the service contract requires each of the four banks of the plant meet the potable water standards. Ocean Reef argues that this requirement is clear and unambiguous on the face of the agreement. In the alternative, ORC argues that if the Court finds the agreement to be ambiguous in this regard; parol evidence is admissible to cure the ambiguity and this evidence will prove that it was the intent of the parties at all times for each bank to separately meet the requisite standards.[6] Conversely, UOP asserts that the agreement is unambiguous and required UOP to maintain the system so that it produced 930,000 gpd of product water meeting the potability standards. UOP contends that it is clear from the contract that UOP had no obligation to maintain each bank so that it met those standards and, therefore, no parol evidence is admissible.

■ Under Florida law, parol evidence is admissible to prove the elements of an agreement where a writing is ambiguous on its face or fails to contain the elements of a complete contract. *Everglades Lumber Co. v. Rettleton Lumber Co.,* 111 Fla. 333, 149 So. 736 (1933); *Industries, Investments, etc., v. Panelfab International Corp.,* 529 F.2d 1203 (5th Cir.1976). "Whether a contract is or is not ambiguous is a question of

law to be determined by the trial court. *Pipher v. FMC Corp.,* 427 F.2d 353 (5th Cir.1970); *East Coast Electronics, Inc., v. Walter E. Heller Co.,* 355 F.2d 923 (5th Cir.1966). Once the trial court determines that a contract is ambiguous, the proper construction of the contract is a question of fact... *Vineberg v. Brunswick, Corp.,* 391 F.2d 184 (5th Cir.1968); *Hollywood v. Zinkil,* 283 So.2d 581 (Fla. 4th DCT 1973)" 529 F.2d at 1211.

■ The Florida courts have recognized that if the writing in the contract in question is susceptible of either of the divergent meanings contended for by the parties it presents a latent ambiguity. *Atlantic & Gulf Properties, Inc. v. Palmer,* 109 So.2d 768 (Fla. 3d 1959). The Florida Supreme Court has stated that the word, "ambiguity", when used in reference to a word or phrase in a contract, means that such word or phrase is "of uncertain meaning, and may be fairly understood in more ways than one..." *Friedman v. Virginia Metal Products Corp.,* 56 So.2d 515, 517 (Fla.1952).

■ It is the view of the Court that the contract at issue is subject to either of the meanings advanced by the parties. This ambiguity arises out of the Court's reading of two portions of the contract. Paragraph 2 states:

"2. UOP'S RESPONSIBILITIES

A. UOP agrees to perform the following services to maintain the System at 630,000 gpd permeate capacity until the 300,000 gpd additional which is the subject of another contract goes into regular operation, and thereafter at 930,000 gpd permeate capacity (using feedwater complying with the analysis on Attachment A) that has a total dissolved solids con-

---

6. Actually, ORC has plead a third alternate theory of recovery; fraud. In essence, Count III alleges that even if the Court finds that the contract, with or without the use of parol evidence, does not require UOP to maintain the system so that each bank produces potable water, ORC should recover the cost of the replacement modules because they were fraudulently induced into signing the contract by UOP's representations that the system would be so maintained. After reviewing the record, however, the Court finds that ORC's claim of

fraud is not supported by the evidence. Nothing indicates that UOP made the alleged misstatement regarding performance of the system and even if there were discussions that ORC construed to mean each bank would produce potable water, said statements were not made by UOP with the knowledge that they were false and with intent to deceive. Therefore, the Court finds in favor of UOP on Count III of the complaint. *See generally,* 27 Fla.Jur. *Fraud and Deceit, Alexander/Davis Properties, Inc. v. Graham,* 397 So.2d 699 (Fla. 4th DCA 1981).

tent of 500 parts per million maximum, sampled at the outlet flange, of the UOP Reverse Osmosis System and meeting all other potability standards as set forth by the U.S. Public Health service in its Publication No. 950 dated 1962:

(i) Provide replacement parts and labor to install replacements as required.

(ii) Provide replacement ROGA membrane modules as required.

(iii) Make available, upon request, service personnel for corrective maintenance.

B. The system is that which, at the effective date of this Agreement is owned by Ocean Reef (to be enlarged by due performance of the aforesaid separate contract for a 300,000 gpd capacity addition) and any parts, ROGA membrane modules, meters, or other components of the system which shall be installed by UOP as replacements or during maintenance services under this Agreement. This Agreement does not obligate UOP to any responsibility hereunder for any but the services stipulated herein on anything but such system except as may subsequently be agreed upon in writing."

Read alone, this section indicates that UOP is obligated to maintain a system that produces 930,000 gpd of potable water. However, paragraph 2 cannot be read alone because paragraph 6 supplies the operative definition of the "System."

6. LIQUIDATED DAMAGES

It is agreed by both parties that for the purposes of treated water output, the system consists of three (3) 210,000 gpd sections and one (1) 300,000 gpd section operating in parallel. In the event that one or more of the sections of the system becomes inoperable due to system or module malfunction and not because of failure of the feedwater or electrical supply nor by abuse or by failure on the part of Ocean Reef or its agents to follow recommended operating procedures, UOP will be liable to possible liquidated damages payments.

When read in conjunction these sections may fairly be interpreted to mean that the system as a whole must produce 930,000 gpd of potable water *or* that this "system", i.e. three 210,000 gpd units and one 300,000 gpd unit, must each produce potable water for a total of 930,000 gpd. Therefore, the Court will consider, as a basis for its findings, the parol evidence presented by the parties during the trial of this cause.

■ A great deal of the parol evidence presented by Plaintiff dealt with prior dealings between the parties. The evidence shows as follows:

1) In 1972 Ocean Reef contracted with UOP to have their 340,000 gpd "two pass" system modified into a 630,000 gpd one pass system consisting of three 210,000 gpd banks. (Banks 1A, 1B, 1C)

2) Units 1A, 1B and 1C were consistently maintained from 1972 to mid 1977, so that each unit was capable of producing potable water.

3) In May, 1973, Ocean Reef contracted with UOP for construction of an additional 300,000 gpd unit (2A). UOP was aware that Ocean Reef purchased unit 2A for use as a "peaking" plant; a plant that would be used only when extra water was needed, not all the time.

4) Daily water quality tests were taken from each bank of the system (1A, 1B, 1C, and 2A). These tests never involved blending the product water from all four banks.

The evidence regarding the parties' prior dealings indicates that the parties did not intend to have the system maintained so marginally that the failure of unit 2A would cause Ocean Reef to be without potable water. The parties' intent was for each bank to be capable of producing water of suitable quality so that, in the event one or more banks failed, the worst result would be a shortage of potable water. The Court finds, therefore, that the preponderance of the evidence supports Ocean Reef's construction of the agreement, to wit: that UOP had a duty to maintain the system so that the product water from each bank met the potability standards. The Court fur-

ther finds that unit 1B consistently failed to meet these standards from mid April, 1977 until the expiration of the service agreement, unit 1A and 1C periodically failed to meet the standards during the same period, and that unit 1A, 1B, and 1C failed to meet these standards throughout the month of December 1977.

■ The question of whether UOP's failure to maintain the system constitutes a breach of contract or negligence is not an easy one to answer.[7] "The relation between the remedies in contract and tort presents a very confusing field, still in the process of development, in which few courts have made any attempt to chart a path." Prosser, *Torts*, at 614 (4th Ed. 1971). In the case at bar, it appears that UOP acted under the mistaken belief that they were only required to maintain the system so that it produced a total output of 930,000 gpd of potable water. UOP did not negligently maintain each bank of the system; rather, they never attempted to make each bank meet the specified standards. Under these circumstances, UOP's actions could not be characterized as unreasonable and, therefore, negligent, but they were contrary to the agreement of the parties; and, therefore, ORC is entitled to prevail on the liability issue as to Count I of the Complaint. 4 Corbin, *Contracts* § 943; Restatement (Second of Contracts § 235.)

## A  DOES THE CONTRACT PRECLUDE ORC FROM RECOVERING DAMAGES FOR BREACH?

ORC's entitlement to damages caused by UOP's breach hinges on the meaning and effect to be given the contract's liquidated damage clause.[8] UOP maintains that the contract exonerates them from liability for *any* breach unless said breach results in a cumulative capacity deficiency in excess of 2 million gallons within a thirty-day period. If a deficiency occurs then the formula set forth in the liquidated damage clause would be used to calculate the amount of damages recoverable. If a deficiency did not occur as a result of UOP's breach they contend they cannot be held liable for damages. In effect, UOP contends that if they breach the contract they cannot be held liable therefore unless their acts result in an insufficient water supply at ORC.

■ The Court believes that the liquidated damages clause is inapplicable to ORC's breach of contract claim for two reasons: (1) the type of breach established by ORC was not within the coverage of the clause because it did not result in a water deficiency and (2) the liquidated damage clause is unconscionable and therefore void. With regard to the first reason, it is clear to the Court that the parties intended the measure of damages set forth in the liquidated damage clause only to cover breaches that resulted in a water deficiency. In such a circumstance it would have been very difficult to calculate the actual amount of damages ORC would incur and, therefore, it was necessary to have a contractual formula. However, it was never the intent of the parties to preclude ORC from recovering damages for breach if the breach did not result in a shortage of water. As was the case here, if UOP's breach resulted in a readily ascertainable amount of damage, ORC's entitlement thereto should be determined by law, not by the stipulation contained in the contract. *Moses v. Autuono,* 56 Fla. 499, 47 So. 925 (1908); *Pembroke v. Caudill,* 160 Fla. 948, 37 So.2d 538 (1948); *Carol Managment Co. v. Baring Industries,* 257 So.2d 270 (Fla. 3rd DCA 1972); *Refram v. Porter,* 343 So.2d 1343 (Fla. 2d DCA 1977).

7. Plaintiff is seeking the same amount of damages under both theories of recovery.

8. UOP relies on the language of paragraph 8(B) in addition to the liquidated damage clause to limit their liability. However, the Court views that particular language as an extension of the liquidated damage clause not a separate disclaimer of liability. In effect, 8(B) says that

UOP cannot be held liable for indirect, special, or consequential damages ... as a result of a shortage of water at ORC other than as provided for in the liquidated damage clause. It does not cover breaches that do not result in water shortages such as the breach alleged and proven here.

■ Secondly, even if the liquidated damage clause is applicable, it should not be enforced because, to the extent UOP's breach created a need to purchase water, ORC was unable to do so. The evidence shows that at the time of the breach the Florida Keys Aquaduct Authority was unable to supply ORC with water. This situation was not contemplated by the parties at the time the liquidated damage clause was originally drafted and was not taken into account at the time the new service agreement was drafted in 1974. Thus, ORC had no choice but to repair the system by installation of new modules and requiring them to be bound by a contractual provision for damages which contemplated the availability of an alternate source of water would be unconscionable.

Based on the reasons set forth above, the Court finds that ORC's claim for damages is not barred by the contract and that they are entitled to recover the costs reasonably incurred in bringing the system within the specified performance criteria.

### B THE AMOUNT OF OCEAN REEF'S DAMAGES

The evidence shows that after expiration of the agreement with UOP, ORC started looking for new sources for the RO modules needed to run the system. Ultimately they decided to purchase 396 new modules and related fittings from Enviorgenics Systems at a cost, including freight, of $98,253.09. These modules were placed in unit 2A. Most of the modules removed from unit 2A were put into unit 1B, thereby making it capable of producing potable water, and the remainder of 2A's modules were put into

unit 1C.[9] In addition to the replacement of the modules, ORC incurred $2,885.69 in costs for repairing certain instruments necessary to restore the system to the capability of meeting the standards set forth in the service agreement. Thus, the total amount of costs reasonably incurred by ORC as a result of UOP's breach is $101,138.78.

### IV UOP's COUNTERCLAIM

UOP's answer contains three counterclaims against Ocean Reef. The first claim seeks recovery of the last seven monthly payments due UOP under the terms of the service agreement that were withheld by ORC. The second claim seeks damages for ORC's alleged negligence in allowing foreign matter to enter and foul the system during the spring of 1977. Finally, UOP seeks to recover the cost of certain equipment stored at the ORC site that ORC refused to return at the expiration of the service contract.

### A RECOVERY OF THE CONTRACT PRICE

The parties have stipulated that Ocean Reef failed to make payments under the service agreement from June through December, 1977. UOP's counterclaim seeks damages in the amount of $71,888, plus interest at the legal rate, based on Ocean Reef's refusal to pay. The computation of these damages in accordance with the agreement is not disputed; the question is whether UOP's breach of the agreement relieved Ocean Reef of the duty to pay.

---

9. The modules removed from unit 1B were discarded. UOP claims that ORC's action in this regard was unreasonable in that they failed to mitigate their damages by determining how many modules needed replacement through use of testing procedures. The Court believes that it would have been time consuming and expensive to test the various banks to ascertain which modules were in the worst condition, and the Court does not find that the procedure utilized by ORC was unreasonable. Moreover, the Court is not satisfied that the calculation performed by Dr. Kremen is accurate in that it takes into account the blended output from all of the banks as opposed to the standards that had to be met for each bank. Therefore, the Court believes that the costs reasonably incurred by ORC as a result of UOP's breach total $101,138.78. The Court finds in favor of ORC as to Count I of the complaint and awards them damages therefore in the amount of $101,138.78. The Court finds in favor of UOP as to Counts II and III. For the reasons set forth in Section IV, *infra,* the Court does not believe that ORC is entitled to have the presently due charges cancelled in spite of the fact that they prevailed on Count I.

UOP contends that they are entitled to recover the unpaid sums from Ocean Reef based on the doctrine of substantial performance and, at best, Ocean Reef is entitled to a set off to the extent they were damaged by UOP's breach. Ocean Reef's response is that proper maintenance of the system is a condition precedent to payment and that UOP's breach excuses them from their duty to make payment.

■ "Substantial performance is that performance of a contract which, while not full performance, is so nearly equivalent to what was bargained from that it would be unreasonable to deny the promisee the full contract price subject to the promisor's right to recover whatever damages may have occasioned him by the promisee's failure to tender full performance. *See* 3A Corbin on Contracts § 702 *et seq.*" *Ocean Ridge Development Corp. v. Quality Plastering Inc.*, 247 So.2d 72 (Fla. 4th DCA 1971); *Bryan and Sons Corp. v. Klefstad*, 237 So.2d 236 (Fla. 4th DCA 1970). Whether or not there has been substantial performance is normally a question of fact for the trier of fact to resolve based on all the relevant evidence. *Id.*

■ The ambiguous language of the service agreement leads this Court to believe that UOP fell into breach under the legitimate, albeit, mistaken impression that the contract required only the blended product water to meet potability standards. Although Plaintiff presented some evidence of bad faith in this regard, the preponderance of the evidence does not support such a finding. It is significant, in this Court's eyes, that Ocean Reef always had enough potable water to meet their needs; it is the means to that end that Ocean Reef complains of. In light of these facts and circumstances, it is the view of the Court that UOP substantially performed their duties under the agreement and, therefore, they are entitled to recover the contract price for their services.

Accordingly, the Court finds in favor of UOP on Count I of the counterclaim and awards them damages therefore in the amount of $77,888, plus interest at the legal rate.[10]

## B EXTRAORDINARY REPAIRS

UOP's second counterclaim seeks recovery of the costs incurred in performing certain extraordinary repairs on the system. In particular, UOP alleges that as a result of ORC's negligence the system's performance was markedly degraded during the spring of 1977 due to the introduction and accumulation of foreign matter on the modules on all four banks of the system. In order to prevent further damage and restore the system's performance, UOP personnel worked for approximately one month to clean the foreign matter from the modules and the interior of the system. The cleaning operation included cleaning of all 1260 modules in the system and chemically treating ("sizing") the modules in units 1A, 1B and 1C. The cleaning and sizing cost UOP $444.38 in purchased materials and $8,067.36 in labor and other services.

■ The evidence shows that the foreign matter, which was of a ferrous nature, originated outside the system, either from a well feedwater line that was improperly purged by ORC personnel or from the pretreatment chemical storage tanks. In either event, the fact that the fouling occurred in all four banks of the system indicates that ORC was responsible for letting it get past the filters and into the system. It is the view of the Court that ORC's actions in this regard were negligent and that ORC is liable for the cost of the repairs proximately caused thereby pursuant to paragraph 2(B)(ii) of the parties' agreement. Accordingly, the Court finds in favor of UOP as to Count II of the counterclaim and awards them damages in the amount of $8,511.74.[11]

10. Within ten (10) days from the date of this Order, UOP shall file a memorandum of law indicating the applicable rate of pre-judgment interest and the amount recoverable based on that rate. ORC may respond to said memorandum within five days after receipt thereof.

11. UOP asserted as an affirmative defense to Counts I–III of the complaint the fact that

## C CONVERSION

The third and final counterclaim asserted by UOP seeks recovery of the cost of certain equipment allegedly converted by ORC after expiration of the service agreement. The parties have stipulated that the equipment in question consists of (1) one 100 horsepower Reliance motor, (2) one 125 horsepower Reliance motor, (3) one Goulds BP200650 pump and (4) one Goulds BP200500 pump and that this equipment was delivered to Ocean Reef in May through September 1976. It is also undisputed that UOP was not allowed to remove this equipment when the service agreement expired. However, the parties do not agree on who owns the equipment.

The evidence shows that the spare parts were delivered to ORC at the request of Bobby Hartley, ORC's director of utilities. Mr. Hartley requested that spare parts be stored at the site to avoid water shortages from occurring in case a vital pump or motor failed and had to be repaired. Storage of the spare parts at the ORC site was in UOP's interest as well, because if such a failure occurred UOP might have become liable for damages. However, by leaving the equipment at ORC, or even installing it in the system when necessary, the equipment did not become the property of ORC; it remained spare parts belonging to UOP that were stored at the Ocean Reef Club merely for the convenience of the parties. It is the view of the Court, therefore, that the equipment should have been returned to UOP when the service agreement expired and that ORC's refusal to do so constituted conversion of the goods in question. Accordingly, the Court finds in favor of UOP in Count III of the counterclaim and awards the $21,758.28 as the value of the goods converted.[12]

ORC's negligence in allowing the fouling to occur was the cause of the damage ORC sought to recover on. It is the view of the Court after examining the record that the evidence does not support UOP's contention in this regard.

12. Although it cannot seriously be contended that ORC's actions in this regard were not willful, the Court finds that there was a genu-

## V THE AMENDED COMPLAINT

The second major claim that Ocean Reef asserts pertains to the fiberglass reinforced plastic ("FRP") pressure vessels installed in the system in 1975. Pressure vessels are the tubes into which the modules are fit, and through which the water flows. Each vessel is about 20 feet long and about 4½ inches in diameter. The original vessels, supplied by UOP to Ocean Reef, were made of carbon steel. However, it soon became evident that steel was not the proper material due to rust and other problems.

In March, 1975, when Ocean Reef agreed to execute the service agreement at issue, UOP agreed to repair and refurbish units 1A, 1B and 1C, in part by replacing the 150 steel vessels in those units with an equal number of FRP tube and collar assemblies. On May 13, 1975, UOP sent its purchase order to the Amalga Corporation providing for UOP's purchase of 150 fiberglass vessels and collars to be installed in units 1A, 1B and 1C. By June, 1975, these tubes had been assembled and installed in units 1A, 1B and 1C. On July 23, 1975, T.J. Larson of UOP wrote a letter to Morris Burk of Ocean Reef and offered to modify unit 2A by replacing its 63 steel vessels with 63 FRP tube and collar assemblies for $20,000. Ocean Reef accepted UOP's offer and by December, 1975, the 63 steel vessels in unit 2A had all been replaced by FRP tube and collar assemblies which were installed into the unit by UOP personnel.

The "assemblies" referred to are composed of a 20 foot long FRP tube, approximately 4½ inches in diameter, with 2 FRP "collars", approximately 5 inches in diameter, bonded to each end. After the collars are bonded to the tube and the modules are placed therein, a plug is inserted in the end

ine dispute as to who owned the equipment in question and that ORC's actions were not maliciously motivated in order to force UOP to reach another agreement or otherwise. Therefore, the Court believes that UOP's prayer for an award of punitive damages based on ORC's conversion is inappropriate under the circumstances.

of the tube-collar assembly. The plug holds the modules in place and seals the tube; thereby allowing enough pressure to build up for the osmotic process to take place. The plug is, in turn, held in place by a snap ring which fits within a groove that is cut in the collar. A diagram of this assembly appears below

The evidence shows that the FRP tube-collar assemblies were defective and that the defects were manifest in two ways. First, a number of the collars blew off the tubes from the pressure. This type of failure occurred due to defective bonding of the collar to the tube. The second, more prevalent type of failure occurred in the area of the snap ring groove. In these events, the collar, from the groove out, would be severed from the rest of the collar due to the pressure of the water on the end cap and snap ring. The evidence shows that this type of failure was due to UOP's design of the collar assembly in such a way that the plastic in the area of the snap ring groove was too thin to withstand the pressure being exerted on it.[13] In addition, the evidence indicates that UOP's failure to initially install noncorrosive, stainless steel snap rings caused a weakening of the plastic in the grooved area.[14]

After expiration of the service agreement, ORC purchased 30 replacement vessels of a different design from the Amalga Corporation for $6,316.79. Thereafter, rather than replace the old vessels with new ones, ORC contracted with C.T. Jeffrey to repair approximately 346 defective collars at an agreed price of $150.00 per collar. Between December 1979 and July 1980, Jeffrey repaired all of the defective collars and

13. *See* note 5, *supra.*

14. The weakening was manifest by a whitening of the plastic around the snap ring groove. This condition was visible on a large number of the pressure vessels prior to expiration of the service agreement in December, 1977.

invoiced ORC accordingly. ORC paid Jeffrey a total of $51,900.00 for the work performed on the vessels.

### A  WARRANTY DISCLAIMERS

Counts IV through VI of the Amended Complaint allege that UOP breached an express warranty and implied warranties of merchantability and fitness for a particular purpose, respectively, when UOP "sold" and installed the defective FRP vessels in the system in 1975. With regard to the express warranty claim set forth in Count IV, the evidence does not establish that any oral representations were made to ORC relative to the performance of the new vessels. If Ocean Reef were to have a claim based on a breach of warranty it would have to be for warranties created as a matter of law such as those alleged in Counts V and VI. However, the evidence clearly shows that there were express, conspicuous disclaimers of liability for breach of warranty contained in the service agreement, pursuant to which 150 vessels were installed in units 1A, 1B and 1C and in the sales contract covering the 63 vessels purchased for unit 2A. Thus, the warranties sought to be enforced by ORC have been effectively disclaimed and the Court finds in favor of UOP as to Counts IV, V and VI of the complaint.[15]

Count VII of the complaint alleges that UOP's failure to replace the pressure vessels prior to expiration of the service contract constitutes a breach of the contract for which ORC is entitled to recover the cost of replacing and repairing the tubes. The evidence shows that UOP was well aware of the defects in ORC's pressure vessels and that they took some steps to prevent further deterioration of the plastic around the snap ring grooves.[16]

However, these efforts stopped short of replacing the visibly defective vessels. The

15. *See* Fla.Stat. §§ 672.2–316(1), (2), (3).

16. *See* note 14, *supra.*

Court believes that it was UOP's duty under the service agreement to supply ORC with new collars at a minimum and that ORC's engagement of Mr. Jeffrey to reinforce the weakened collars was a reasonable alternative to replacement. Accordingly, the Court finds in favor of Ocean Reef as to Count VII of the complaint and awards them damages in the amount of $58,216.79 as the reasonable costs incurred as a result of UOP's breach.

The Court is also of the view that, in the alternative, UOP could be held liable for the costs incurred in repairing and replacing the defective vessels under Counts VIII and IX. Clearly UOP had a duty to ensure that defective parts of the system were required and replaced and that duty required them to inspect the system to determine which parts needed replacement. Any failure of UOP's part to ascertain that the collars were defective would be unreasonable in this Court's view in light of the readily apparent weakening of the plastic in the snap ring area. It is also the view of the Court that by undertaking the responsibility for designing the pressure vessels, UOP had a duty to ensure that the manufacturer utilized proper material and was supplied with appropriate specifications. This means that UOP had to use reasonable care to design a product suitable for its intended use. Although UOP performed a number of tests to determine the amount of pressure the vessels and collars would withstand, they never tested for the effects of continuous pressure on the snap ring groove or for the effects of salt water and other corrosives. The foreseeable nature of the problems encountered with the collars leads the Court to conclude that UOP breached its duty to design the collars in a manner suitable for their intended purpose. Thus, the Court finds in favor of ORC as to Counts VIII and IX but awards no damages therefore because ORC has already been compensated based on the Court's ruling as to Count VII.

Based on the foregoing Findings of Fact and Conclusions of Law, it is hereby,

ORDERED AND ADJUDGED as follows:

1. The Court finds in favor of the Plaintiff, Ocean Reef Club, Inc., as to Count I of the complaint and awards it damages therefore in the amount of $101,138.78.

2. The Court finds in favor of the Defendant, UOP, Inc. as to Counts II and III of the complaint and awards $0.00 in damages thereon.

3. The Court finds in favor of the Defendant/Counterplaintiff UOP, Inc. as to Count I of the counterclaim and awards it damages in the amount of $77,888.00 plus interest at the legal rate.

4. The Court finds in favor of the Defendant/Counterplaintiff UOP, Inc., as to Count II of the counterclaim and awards it damages therefore in the amount of $8,511.74.

5. The Court finds in favor of the Defendant/Counterplaintiff as to Count III of the counterclaim and awards it damages in the amount of $21,758.28.

6. The Court finds against the Plaintiff, Ocean Reef Club, Inc., and in favor of the Defendant, UOP, Inc., as to Counts IV, V and VI of the Amended Complaint.

7. The Court finds in favor of the Plaintiff, Ocean Reef Club, Inc. and awards it damages in the amount of $58,216.79 as to Count VII of the Amended Complaint.

8. The Court finds in favor of the Plaintiff, Ocean Reef Club, Inc. as to Counts VIII and IX of the Amended Complaint but awards –0– damages in view of the award of $58,216.79 as to Count VII.

DONE AND ORDERED in Chambers at Miami, Florida, this 20 day of Dec., 1982.[17]

---

17. Counsel for the Plaintiff shall within 20 days from the date of this Order submit a proposed Final Judgment incorporating therein the interest figures referred to in Footnote 10 and such other interest figures as may be applicable and that counsel for the defendant shall have 5 days thereafter to file objections.